**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
STEVE FLEMING AND OLD BLACKTHORN
INN, INC.,

                          Plaintiffs,

      v.

                                                  **MEMORANDUM AND ORDER**

VILLAGE OF ROCKVILLE CENTRE; FRANCIS
X. MURRAY, individually and in oficial capacity;            2:19-cv-5435 (JS)(LGD)
PAUL W. POPE JR., individually and in official
capacity; and "JOHN/JANE DOES" 1 through 10
(whose identities are currently unknown to Plaintiff
but are believed to be employees of the Village of
Rockville Centre, al lof whom are sued in their
individual capacities),

                          Defendants.
-------------------------------------------------------------X

**LEE G. DUNST**, Magistrate Judge:

        Defendants Village of Rockville Centre, Francis X. Murray, and Paul W. Pope, Jr. move

*in limine* to exclude the testimony and report of Plaintiffs' proffered expert on police procedure,

Mr. Michael Charles, pursuant to Federal Rules of Evidence 403 and 702. *See* ECF No. 79 (the

"Motion"); ECF No. 79-2 (the "Report"). On April 4, 2025, District Judge Joanna Seybert

referred the Motion to the undersigned for decision pursuant to Federal Rule of Civil Procedure

72(a). *See* Electronic Order, dated April 4, 2025. On July 31, 2025, Mr. Charles testified at a

hearing before the undersigned pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509

U.S. 579 (1993) and its progeny. For the reasons that follow, based on the Court's review of Mr.

Charles's report, his testimony, and the applicable legal standards, the Court concludes that Mr.

Charles's opinions are not admissible. Some of Mr. Charles's opinions are devoid of any

meaningful explanation at all, others improperly set forth legal conclusions, while still others

opine on topics that are not appropriate for expert testimony. Accordingly, Defendants' Motion is granted, and the testimony of Mr. Charles shall be excluded.

## I.  BACKGROUND

### A.  Factual Background[1]

Plaintiff Steve Fleming was an officer and shareholder of Plaintiff Old Blackthorn Inn, Inc. ECF No. 7 ¶ 8. Plaintiff Old Blackthorn Inn, Inc. operated a bar and restaurant called Old Blackthorn Inn in the Village of Rockville Centre in Nassau County. *Id.* ¶ 9. Plaintiff Fleming ran the day-to-day operations of Old Blackthorn Inn. *Id.* Old Blackthorn Inn—which the Court will refer to as the "Blackthorn"—was located on North Village Avenue in Rockville Centre in the Village's business district and in close proximity to the Long Island Railroad Station. *Id.* ¶ 21.

According to Plaintiffs, the Village of Rockville Centre is a predominantly white community. *Id.* ¶ 28. Accordingly, most restaurants and bars in the area serviced a primarily white clientele. *Id.* However, following the closure of a popular bar in nearby Freeport, New York, Black customers began to frequent Blackthorn, which contracted with a Black-owned security company, employed Black security guards, and was viewed as "culturally accepting" towards Black customers. *Id.* ¶¶ 30-36.

In sum, Plaintiffs contend that racial animus against the Black patrons of the Blackthorn resulted in unwarranted police attention, which later resulted in referrals to the State Liquor Authority ("SLA"), which suspended the Blackthorn's liquor license and led to the eventual closure of the Blackthorn.

---

[1] These facts are taken from the Amended Complaint and are set forth only for purposes of providing context for Mr. Charles's Report.

Specifically, beginning in 2016, Plaintiffs allege that the Village began conducting a series of inspections at the Blackthorn. Defendants Francis X. Murray (the police commissioner of the Rockville Centre Police Department) and Paul W. Pope, Jr. (a police patrol supervisor and sergeant) allegedly led the charge. The investigation began when an officer informed Mr. Fleming that the Blackthorn had apparently been "infiltrated" by "African American gangs" from Far Rockaway, New York. *Id.* ¶ 45. Pope conducted a random inspection at approximately 3:00 AM on May 29, 2016. *Id.* ¶ 48. Pope allegedly made numerous racist comments to Mr. Fleming, including referring to the predominantly Black clientele as "undesirables," and bemoaning the "hip-hop" music playing in the club. *Id.* ¶¶ 52, 55. Another officer working with Pope apparently told Fleming that, "[w]e hear your jungle music all the way over at the station. You're calling in every thug from Rockaway to Hempstead." *Id.* ¶ 60. Mr. Fleming met with Pope on May 30, 2016. *Id.* ¶ 62. Pope told Mr. Fleming that there was gang activity at Blackthorn. *Id.* ¶ 63. Although Mr. Fleming rejected the accusation, he agreed to add security cameras and lighting fixtures to the facility. *Id.* ¶ 69.

On September 24, 2016, two Blackthorn customers had a fight. *Id.* ¶ 70. According to Plaintiffs, security responded swiftly and restored order. *Id.* ¶ 71-76. The officers present (who did not include Pope) allegedly told Plaintiffs they were impressed by the security officers' response and no ticket was issued. *Id.*

A second fight took place in the early morning of September 26, 2016. *Id.* ¶ 77. A white non-customer attacked a Black customer because he believed the Black customer was at Blackthorn with the white non-customer's girlfriend. *Id.* ¶¶ 77-78. Although Blackthorn security attempted to intervene, the fight apparently got out of hand as "hundreds of people"— most of whom were Black—"gathered near the fight." *Id.* ¶¶ 80-81. And although Blackthorn

staff telephoned the police no fewer than six times, the police did not respond for over 45 minutes. *Id.* ¶ 80. When the police arrived, they arrested the Black patron and not "the white instigator," which resulted in the largely Black crowd chanting "Black Lives Matter." *Id.* ¶ 82.

Following these two fights, Pope informed Mr. Fleming on October 3, 2016 that "the fun is over" and that Blackthorn was "at the top of my hit list. No more warnings. I'm shutting you down." *Id.* ¶ 85. That day, Defendants issued seven citations for violations of state Alcohol Beverage Control ("ABC") Laws and General Business Law. *Id.* ¶ 90. Defendants issued thirty additional citations within the next three months—many of which were backdated by weeks or months. *Id.* ¶ 91.

In response, the SLA served Notices of Pleadings[2] on Blackthorn on November 3, 2016, November 7, 2016, November 16, 2016, and December 20, 2016. *Id.* ¶ 93. On December 22, 2016, the SLA suspended Blackthorn's liquor license. *Id.* ¶ 98. Plaintiffs commenced an Article 78 proceeding in New York State Supreme Court the next day. *Id.* ¶ 100. Plaintiffs were ultimately successful in part, as Blackthorn's liquor license was reinstated, but it was required to implement a curfew and could not have live music or DJs. *Id.* ¶ 101. As a result, Blackthorn lost significant business during the holiday season and the next year and ultimately was forced to close. *Id.* ¶ 105.

Plaintiffs claim that Blackthorn was subjected to disparate treatment as compared with other bars that did not serve a primarily Black clientele or employ primarily Black security guards. *Id.* ¶¶ 108-09. For example, Plaintiffs allege that Kasey's Kitchen & Cocktails received better treatment from the Rockville Centre Police Department even after a stabbing took place on

---

[2] According to the SLA's website, a Notice of Pleading is issued following a violation of law and sets forth the alleged violations. *Enforcement*, N.Y. State Liquor Auth., https://sla.ny.gov/enforcement (last visited Sept. 22, 2025).

the premises. *Id.* ¶ 111(A). Additionally, Plaintiffs contend that Churchill's, another bar in the Village, was not singled out for enforcement despite multiple fights and two customers being drugged. *Id.* ¶ 111(B). In sum, Plaintiffs contend that conduct that resulted in harsh treatment at Blackthorn (*e.g.*, fights) did not result in comparable treatment when it occurred at predominantly white establishments.

### B. Procedural History

Plaintiffs commenced this action on September 24, 2019. ECF No. 1. The Amended Complaint asserts claims under 42 U.S.C. § 1983 alleging deprivation of Plaintiffs' rights under the First, Fourth, and Fourteenth Amendments, including (for example) denial of equal protection and freedom from malicious prosecution and abuse of process. ECF No. 7. Additionally, Plaintiffs assert a claim under *Monell v. Department of Social Services*, 436 U.S. 658 (1978) based on an alleged failure to train, supervise, or discipline. *Id.*

Over the next few years, discovery in this case was plagued by repeated extension requests and discovery disputes. *See, e.g.*, ECF No. 18; ECF No. 19; ECF No. 21; ECF No. 22; ECF No. 24; ECF No. 27; ECF No. 28; ECF No. 31; ECF No. 34; ECF No. 38; ECF No. 39; ECF No. 43; ECF No. 45; ECF No. 54; ECF No. 55; ECF No. 56; ECF No. 63; ECF No. 64; ECF No. 67.[3] In total, the parties requested *at least* 15 extension of the schedule. Following discovery, the parties advised Judge Seybert that they intended to pursue dispositive motion practice but sought to hold any such briefing pending the resolution of an anticipated motion to exclude the testimony of Plaintiff's expert. *See* Electronic Order, dated October 16, 2024. The parties bundle filed their submissions on January 21, 2025. *See* ECF No. 79-24 (Memorandum in Support); ECF No. 79-30 (Memorandum in Opposition); ECF No. 79-31 (Reply

---

[3] This case was filed on September 24, 2019, and was randomly reassigned to the undersigned on June 7, 2022. *See* Electronic Order, dated June 7, 2022.

Memorandum). The parties' submissions totaled more than 1400 pages.

On April 4, 2025, Judge Seybert referred the Motion to the undersigned for a decision. *See* Electronic Order, dated April 4, 2025. The undersigned held a status conference on May 21, 2025, to discuss the scope of the Motion. *See* ECF No. 81. Subsequently, on June 6, 2025, Plaintiffs advised the Court that they were withdrawing some, but not all, of Mr. Charles's opinions. ECF No. 82. Mr. Charles testified at a *Daubert* hearing on July 31, 2025. *See* ECF No. 84 (the "July 31, 2025 *Daubert* Hearing"). Mr. Charles was subjected to both direct and cross examination.

### C. Mr. Charles's Expert Report

#### 1. Mr. Charles's Background

Plaintiff engaged the services of Mr. Michael Charles—a purported police procedures expert. Mr. Charles is a private investigator who specializes in the fields of security and law enforcement. Transcript of Proceedings ("Tr.") 12:16-17. He is a retired member of the New York Police Department who served from 1983 to 2001, retiring as a detective. *Id.* at 16:2-6. Mr. Charles founded MCS Consultants in 1988. *Id.* at 17:1-6. The focus of the business is twofold: it is both "a security company" and a "private investigations firm." *Id.* at 17:8-10. The Court's attempt to fully ascertain the scope of Mr. Charles's background has been hampered by his failure to include a curriculum vitae. But the Court can glean from the Report and from Mr. Charles's testimony at the July 31, 2025 *Daubert* Hearing that Mr. Charles has testified in state court proceedings, but never in federal court. *Id.* at 96:3-97:23. As discussed more fully below, the extent of that expert testimony in state court is not clear.

#### 2. Mr. Charles's Methodology

Mr. Charles produced a report dated "April 2024." ECF No. 79-2. Despite a careful review of the Report and extensive testimony at the July 31, 2025 *Daubert* Hearing, Mr.

Charles's methodology used in preparing his report is far from clear. At the hearing, Mr. Charles emphasized—no fewer than thirteen times—that his sources consisted of interviews (some with unnamed witnesses), video review, "blotter entries" review, and looking at "other establishments within the Village of Rockville Centre." Tr. 13:2-6.[4] Mr. Charles analogized the process of writing his report to building a house. "When I conduct interviews, it's like building a house; start in the basement, foundation, and you work your way up. I would speak to people, they would tell me things, and I would try to go out and find those facts." *Id.* at 91:12-15; *see also id.* at 94:15-21 ("I'm going to go through this again. You're building a house. Put the foundation in the basement, the lumber on the first floor. By me interviewing people, I'm looking to put the lumber on the first floor. Whatever they tell me, I have to get facts in order to believe what they're telling me.").

Mr. Charles took the findings of his investigation (*i.e.*, the interviews he conducted, a review of the blotter reports, deposition testimony, etc.) and constructed a timeline, which is set forth in Exhibit 1 of the Report. ECF No. 79-2 at 9-15. The timeline purports to be a factual

---

[4] Mr. Charles's invocation of these factors became something of a mantra during the July 31, 2025 *Daubert* Hearing. *See, e.g.*, Tr. 19:22-25 ("Looked through their blotter, looked through e-mails, interviewed some people."); *id.* at 24:17-19 ("Yes. I would look up on the blotter e-mails and try and corroborate what they're telling me, if it's factual."); *id.* at 25:16-19 ("Q: What method did you use to determine that? A: E-mails, blotter entry. Q: Anything else? A: Observations, video."); *id.* at 30:3-5 ("Q: Where did you get that testimony from? A: E-mails. Steve Fleming, blotter entries."); *id.* at 39:13-17 (". . . E-mails, police blotter, discovery."); *id.* at 43:1-3 (Q: What records did you review in reaching your conclusion that this was unmerited? A: E-mails, police blotter, discovery."); *id.* at 47 ("THE COURT: Any other source that formed the basis of that opinion? THE WITNESS: I looked at the police blotter."); *id.* at 49 ("Q: What evidence did you review to determine that the Rockville Centre PD lacked such policy and practice concerning SLA violations? A: Blotter entries, e-mails, video."); *id.* at 56:7-9 ("Q: What other evidence did you review other than e-mails and things like that to make this determination? A: Depositions, blotter entries, e-mails."); *id.* at 58:17-20 ("Q: Mr. Charles, in creating your opinions in writing this report, did you rely on the information contained in the timeline of events? A: I relied on e-mails, police blotter, and depositions."); *id.* at 66:3-5 ("Q: In forming any of the 11 opinions that Mr. Famighetti went through with you, did you confer with any SLA materials? A: E-mails, police blotters, depositions."); *id.* at 74:9-14 ("Q: Okay. Did you consult with an entity? A: E-mails, discovery, blotter."). The assertion regarding Mr. Charles's apparent review of the deposition transcripts is odd, because at his own deposition, Mr. Charles testified that he did not review the depositions of all the central witnesses in this case, including Fleming, Pope, Gennario, Murray, and Norwood. ECF No. 79-3 at 35-36.

document, but it relies in part on documents that apparently were not produced in discovery or never provided to Defendants.  *See, e.g.*, *id.* at 14 (relying on a newspaper article); *id.* at 14-15 (same); *id.* at 15 (same).  Additionally, Mr. Charles apparently spoke to individuals who wanted to remain anonymous, and Mr. Charles did not take notes during those interviews or make a record of them.  Tr. 78.[5]  Indeed, Mr. Charles confirmed that he spoke to numerous additional individuals not even listed in his report.  *Id.* at 84:25-85:2.  Defendants obviously have not had (and presumably will not have) the opportunity to examine these individuals.  Exhibit 2 to the Report purports to be a list of police blotter entries for various establishments in Rockville Centre, which Mr. Charles apparently secured through a Freedom of Information Law (FOIL) request.  ECF No. 79-2 at 17-19.[6]

### 3. Mr. Charles's Opinions

Mr. Charles's proffered opinions fall into a few categories.[7]  First, Mr. Charles contends that the Blackthorn "[1] was racially profiled" and "[2] was a victim of selective enforcement." *Id.* at 2.  Mr. Charles also contends that the tickets given to the Blackthorn—for [3] disorderly premise, [4] failure to comply, [5] "books and records" and "failure to post signs"—were unmerited and that "[8] Pope created a false narrative and painted a distorted picture for the

---

[5] When questioned about this topic at his deposition, Mr. Charles asserted that the way to know that the information from these apparent interviews is accurate is simply to trust him:  "I give you my word."  ECF No. 79-3 at 28:5-6.

[6] Plaintiff's brief opposing the *in limine* motion describes a report that does not in fact exist.  It neatly lays out why Mr. Charles is qualified, why his methodology is reliable, and why his opinions are helpful.  For example, it describes a "pattern analysis" that apparently cross-referenced deposition transcripts and "applied widely recognized benchmarks in regulatory compliance."  ECF No. 79-30 at 11-12.  The process for undertaking that analysis is not described in the Report, and the results reached in the report are often without explanation and inconsistent with Mr. Charles's testimony.

[7] The presentation of Mr. Charles's Report lends itself to a numerical assignment for each opinion, as each opinion is laid out in a separate paragraph.  As reflected in the July 31, 2025 *Daubert* Hearing, the Court assigned numbers to each of Mr. Charles's 16 opinions.  For purposes of this Memorandum and Order, the Court places those assigned numbers in brackets before each opinion, so that the reader may easily cross reference this opinion, the transcript, and Mr. Charles's Report.

SLA with a barrage of undeserved tickets." *Id.* at 3-4. Next, Mr. Charles avers that [6] the "two focal point investigations" and [7] the emergency liquor license suspension by the SLA were not warranted. *Id.* Finally, Mr. Charles asserts that [10] the Rockville Centre Police Department has insufficient procedures for SLA inspections, that "[11] Pope is extremely incompetent when it comes to writing a disorderly premise ticket," and that "[12] Pope was clearly using this freedom as an 'SLA' supervisor to be a rogue police officer." *Id.* at 5-6.[8] For ease of reference, the Court sets forth the opinions below from the Report (but excludes the relevant "reasons for them").

> [#1] It is my opinion that the Blackthorn was racially profiled.
>
> [#2] It is my opinion that the Blackthorn was a victim of selective enforcement.
>
> [#3] It is my opinion that the Blackthorns disorderly premise tickets were unmerited.
>
> [#4] It is my opinion that the Blackthorns failure to comply tickets were all unfounded.
>
> [#5] It is my opinion that the Blackthorns 'books and records' and the 'failure to post signs' and 'failure to supervise tickets' are completely without cause.
>
> [#6] It is my opinion that the Blackthorns two focal point investigations were unmerited.
>
> [#7] It is my opinion that Blackthorn's Emergency Suspension was unmerited.
>
> [#8] It is my opinion Pope created a false narrative and painted a distorted

---

[8] Mr. Charles's Report sets forth five additional opinions which Plaintiff no longer seeks to admit. That is a wise choice. The majority of these opinions impermissibly opine on witness credibility. *See* ECF No. 79-2 at 3-6 ("[9] In my opinion, from reading the depositions from Commissioner Gennario, Mayor Murray and Paul Pope[,] [t]hey are not being truthful."); *id.* ("[13] It is my opinion that Pope lied on the 9/24/16 incident report."); *id.* ([14] "It is my opinion that Mayor Murray was untruthful in his deposition."); *id.* ("[15] It is my opinion that Mayor Murray was untruthful in his deposition."). The final opinion improperly usurps the role of the jury as fact finder, as it explicitly opines that the allegations in the Amended Complaint have been proven. *See id.* ("[16] [I]t is my opinion, that the Amended Complaint filed in district court is well supported by evidence in discovery."). A jury does not need Mr. Charles's assistance to reach that conclusion or any other.

picture for the SLA with a barrage of undeserved tickets, violations and summonses following the BLM event.

[#9] In my opinion, from reading the depositions from Commissioner Gennario, Mayor Murray and Paul Pope[,] [t]hey are not being truthful.

[#10] It is also my opinion that the RVCPD does not know what they are doing when it comes to SLA inspections or enforcing ABC laws in general.

[#11] It's also my opinion, that at first glance it appears that Officer Pope is extremely incompetent when it comes to writing a disorderly premise ticket as to when one should and could be written.

[#12] It's my opinion Pope was clearly using this freedom as an "SLA" supervisor to be a rogue police officer.

[#13] It is my opinion that Pope lied on the 9/24/16 incident report, that was written over a month after the fact on 11/5/16.

[#14] It is my opinion that Mayor Murray was untruthful in his deposition when he said he is not aware and has never heard anything about Churchill's employees and the owners getting special parking treatment in the lot behind their establishment.

[#15] It is my opinion that Commissioner Gennario was untruthful in his deposition

[#16] I have concluded, and it is my opinion, that the Amended Complaint filed in district court is well supported by evidence in discovery.

*Id.* at 3-6.

## II.    LEGAL STANDARDS

Federal Rule of Evidence 702 governs the admissibility of expert testimony in Federal

Court.  That rule permits courts to admit expert testimony where:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The proponent of the expert testimony bears the burden of showing that it is "more likely than not" that the testimony is admissible.  *Id.*; *accord Canon U.S.A., Inc. v. F&E Trading LLC*, No. 15-CV-6015, 2023 WL 5152448, at *2 (E.D.N.Y. June 6, 2023) ("The proponent of the expert testimony has the burden of establishing, by a preponderance of the evidence, that the testimony is competent, relevant, and reliable.") (citing *Daubert*, 509 U.S. at 592-93 & n.10).

Under Rule 702, expert testimony is admissible if "(1) the witness is qualified to be an expert; (2) the opinion is based upon reliable data and methodology; and (3) the expert's testimony on a particular issue will "assist the trier of fact." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 638 F. Supp. 3d 227, 242 (E.D.N.Y. 2022) (quoting *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005)); *see also In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MD-01570, 2024 WL 5077293, at *3 (S.D.N.Y. Dec. 11, 2024) (same), *reconsideration denied*, 2025 WL 370569 (S.D.N.Y. Jan. 31, 2025), *objections overruled*, 2025 WL 2476303 (S.D.N.Y. Aug. 28, 2025).

Courts have routinely noted the important role of the district court as the "ultimate gatekeeper." *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020).  And indeed, Rule 702 was amended in 2023 "in response to court decisions that admitted expert testimony too liberally." *In re Terrorist Attacks*, 2024 WL 5077293, at *3.  Given that "'jurors may lack the specialized knowledge' to evaluate the quality of a witness's [expert] opinion, . . . [c]ourts must withhold endorsement from expert witnesses who fail to meet Rule 702's standards." *Id.* (quoting *United States v. Diaz*, No. 24-cv-0032, 2024 WL 758395, at *5 (D.N.M. Feb. 23, 2024)).

In addition to the requirements set forth in Rule 702, expert testimony—like all

evidence—is subject to Rule 403. *Nimely*, 414 F.3d at 396. Accordingly, the Court may exclude expert testimony where "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

## III. DISCUSSION

### A. Mr. Charles Is Qualified

As a starting point, Defendants do not contest in any meaningful way that Mr. Charles is qualified to testify as an expert. That is for good reason. "Courts in the Second Circuit liberally construe expert-qualification requirements." *Tang Cap. Partners, LP v. BRC Inc.*, 757 F. Supp. 3d 363, 389 (S.D.N.Y. 2024). Mr. Charles served as a member of the New York Police Department for several decades. He thus clearly has both field experience and training in law enforcement and can opine on issues relating to best practices in law enforcement as a general matter. Additionally, he has served as a consultant for numerous police departments since retirement. And indeed, "[t]he testimony of a police procedures expert may be found reliable by virtue of that expert's experience." *Paul v. City of New York*, No. 16-CV-1952, 2023 WL 3724152, at *6 (S.D.N.Y. May 30, 2023).

However, the Court notes again that Mr. Charles failed to produce a CV. *See* Tr. 95:1-17. Accordingly, the Court was tasked with inquiring with respect to Mr. Charles's qualifications at the July 31, 2025 *Daubert* Hearing. *See id.* Mr. Charles's responses left something to be desired. Mr. Charles stated that he has never testified previously as an expert in federal court. *Id.* at 97:17-19. Additionally, Mr. Charles's descriptions of the state court matters in which he testified were vague. *See id.* at 96:3-97:23. For example, Mr. Charles struggled to recall details of that testimony. *Id.* at 97:4-10 (stating he "can't remember" the nature of one of those cases but surmising it may have been a car accident case). The production of a CV could

have easily resolved these issues for the Court. *See* Fed. R. Civ. P. 26(a)(2)(B)(v) (requiring an expert report to contain "a list of all other cases in which, during the previous 4 years, the witness testified as an expert"); *accord Rotman v. Progressive Ins. Co.*, 955 F. Supp. 2d 272, 282 (D. Vt. 2013) (noting that "[i]t is thus unclear whether the court has been presented with an accurate description of [the witness's] experience as an expert," but assuming *arguendo* that the witness was qualified). Finally, Mr. Charles apparently last testified in court as an expert in 2009 or 2010, although the Court cannot be sure because no CV was provided. *Id.* at 97:12-14. Despite these reservations, because Mr. Charles has substantial law enforcement experience and Defendants do not seriously contest his qualifications to opine on police practices as a general matter, the Court concludes that Mr. Charles is qualified to testify as an expert.

B. **Mr. Charles's Opinions Are Not Admissible**

The Court now turns to the substance of Mr. Charles's opinions. As noted above, Plaintiffs have withdrawn some of the opinions in the Report and no longer intend to seek Mr. Charles's testimony on those issues. Accordingly, the Court addresses only the surviving eleven opinions in the Report. As set forth below, Plaintiffs have failed to meet their burden as to all eleven opinions preferred by Mr. Charles.

1. Mr. Charles's First and Second Opinion Are Inadmissible

Mr. Charles opines that the Blackthorn was "[1] racially profiled" and "[2] a victim of selective enforcement." ECF No. 79-2 at 3. These opinions are not admissible.

With respect to the first opinion, Mr. Charles impermissibly assigns a motive to Defendants, asserting that cameras and officers were set up to observe "male and female blacks exiting their cars and entering the Blackthorn." *Id.* It is well established that experts cannot testify as to an individual's motivation. *See, e.g.*, *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 46 (S.D.N.Y. 2016). By asserting that the officers set up surveillance to observe male

and female Blacks, Mr. Charles exceeds the scope of proper expert testimony. *See id.* (excluding testimony that "assign[ed]" [the defendant's] motivation or intent"). Additionally, Mr. Charles's opinion is based on pure speculation at this stage. It is certainly possible, as Mr. Charles opines, that "marked units pull[ed] these African Americans over after they left the Blackthorn despite no visible gang colors, signs, or affiliation." ECF No. 79-2 at 3. However, Mr. Charles does not endeavor to explain the number of Black individuals pulled over as compared to those of other races. *See Cerbelli v. City of New York*, No. 99-CV-6846, 2006 WL 2792755, at *2 (E.D.N.Y. Sept. 27, 2006) (excluding expert testimony where the expert did not provide an explanation for his conclusions or explain how a policing program the expert supported could have been effectively implemented).

Further troubling is that Mr. Charles has provided no information with respect to how he obtained the information that purports to support his first opinion. At his deposition, Mr. Charles stated that the information regarding the camera was disclosed to him by anonymous witnesses. ECF No. 79-3 at 41:13-22 ("Q: You observed it? A: People observed it, told us. Multiple people told us. Q: Who observed it, and who told you? A: People who frequented the club told us. Didn't want to get involved."). Mr. Charles went on:

> Q: So, Mr. Charles, I'll ask it a different way. You've made these statements and opinions. Are these statements and opinions that I just said to you on the basis of documents or deposition testimony given in this case?
>
> A: Yes.
>
> Q: Well, you told me you didn't read the deposition transcripts of any of the witnesses in this case; is that correct?
>
> A: Correct.
>
> Q: Okay. Do you have documents to support these opinions that have been disclosed in the course of fact discovery in this matter?

A: No.  I don't have documents.  I wrote the report.

*Id.* at 43:7-24.  The Court is unable to harmonize Mr. Charles's totally inconsistent statements regarding the formation of this opinion and therefore concludes it must not be admitted.

Mr. Charles's second opinion fares no better.  In concluding that the Blackthorn was a victim of selective enforcement, Mr. Charles compares "severe acts of ABC and General Business Law violations" at other apparently comparable establishments and opines that the Blackthorn was "penalized for every minor infraction" while those other establishments were not ticketed.  ECF No. 79-2 at 3.  It is entirely unclear to the Court what constitutes a "minor infraction" or a "severe" violation of the law in Mr. Charles's view, as he makes no attempt to explain it and points to no examples.  *Id.*  The lack of clarity or explanation severely diminishes any probative value this testimony would have, while simultaneously increasing the prejudice.  Fed. R. Evid. 403.  Additionally, because Mr. Charles does not define what he means by a "severe" or "minor" infraction, does not provide any examples, and does not adequately explain why he reached his conclusion, the testimony is likely to confuse and mislead the jury.  *Id.*  For these reasons, the Court exercises its substantial discretion and concludes that the second opinion is inadmissible.

Mr. Charles's first two opinions are inadmissible for other reasons, too.  Under Federal Rule of Evidence 704, an expert "opinion is not objectionable *just because* it embraces an ultimate issue."  Fed. R. Evid. 704(a) (emphasis added).  Still, "[e]xpert testimony must not 'usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.'" *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14-md-2542, 2025 WL 354671, at *2 (S.D.N.Y. Jan. 30, 2025)

(quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)). Here, Mr. Charles's first and second opinions impermissibly opine on the ultimate issue. Mr. Charles opines that the Blackthorn was "[1] racially profiled" and "[2] a victim of selective enforcement." The Amended Complaint in this case alleges that Plaintiffs were denied "equal protection, privileges, and immunities under the Fourteenth Amendment to the United States Constitution." ECF No. 7 ¶ 120(C). In a case about equal protection, it is up to the jury—not Mr. Charles—to decide whether the Blackthorn was subjected to conduct (like racial profiling or selective enforcement) that could violate the Fourteenth Amendment.

And indeed, courts in this circuit have routinely held that police procedure experts may not, as Mr. Charles does in these opinions, "speculate as to what [they] believe occurred." *Paul*, 2023 WL 3724152, at *6 (citing *Stern v. Shammas*, No. 12-CV-5210, 2015 WL 4530473, at *3 (E.D.N.Y. July 27, 2015)). It is all but certain that Plaintiffs' counsel will make the exact same arguments to the jury that Mr. Charles makes in his first two opinions. Because "[c]ourts also exclude expert testimony that 'supplant[s] the role of counsel in making argument at trial, and the role of the jury [in] interpreting the evidence,'" these opinions must be excluded. *Liberty Mut. Ins. Co. v. Day to Day Imports Inc.*, No. 22-CV-02181, 2025 WL 2117897, at *6 (S.D.N.Y. July 29, 2025) (alterations in original) (citation omitted), *on reconsideration in part*, 2025 WL 2531478 (S.D.N.Y. Sept. 3, 2025).

    2.    <u>Mr. Charles's Third, Fourth, Fifth, and Eighth Opinions Are Inadmissible</u>

Opinions three through five contend that citations issued to Blackthorn for [3] disorderly premise, [4] failure to comply, [5] "books and records", "failure to post signs," and "failure to supervise" were unwarranted. ECF No. 79-2 at 4. In essence, these opinions tell the jury whether Rockville Centre police officers had sufficient factual justification to support a finding that the Blackthorn was not in compliance with state or local law. Such opinions are legal

conclusions and are thus inadmissible. *See Stern v. Shammas*, No. 12-CV-5210, 2015 WL 4530473, at *3 (E.D.N.Y. July 27, 2015) (collecting cases noting that the expert "cannot offer legal conclusions"). Indeed, numerous of the cases cited in *Stern* confirm this point. For example, in *Valentin v. New York City*, No. 94-CV-3911, 1997 WL 33323099, at *24 (E.D.N.Y. Sept. 9, 1997), the court noted that such testimony on legal conclusions raises the risk of confusing the jury with a potentially incorrect legal standard. The concern is especially serious in this case, where Mr. Charles purports to have reviewed but could not identify any of the applicable New York state law provisions. Permitting Mr. Charles to opine on whether he believes particular conduct at the Blackthorn warranted action by Rockville Centre Police Department officers amounts to a legal conclusion on whether the officers were permitted to issue particular citations. *See Felix v. City of New York*, No. 16-CV-5845, 2020 WL 6048153, at *7 (S.D.N.Y. Oct. 13, 2020) (Nathan, J.) ("The Second Circuit has held that expert testimony that police action was not 'justified under the circumstances' offers an impermissible legal conclusion.") (quoting *Hygh v. Jacobs*, 962 F.2d 359, 364 (2d Cir. 1992)); *Fate v. Vill. of Spring Valley*, No. 11-CV-6838, 2013 WL 2649548, at *5 (S.D.N.Y. June 13, 2013) ("[The expert] may not testify that the defendant officers acted in accord with the standard of reasonableness imposed by the Fourth Amendment, nor may he assert in his testimony that actions deemed reasonable when measured against standard police practices are "reasonable" as a matter of constitutional law.").

Mr. Charles's eighth opinion—that "Pope created a false narrative and painted a distorted picture for the SLA with a barrage of undeserved tickets"—suffers the same fatal flaw. ECF No. 79-2 at 5. Mr. Charles's opinion that the tickets were "undeserved" goes to whether the officers had sufficient facts to meet the appropriate legal standard for issuing them. That

testimony is impermissible.  However, Mr. Charles goes on to opine that "[t]he fact that no tickets were written for this May 29th disorderly until months after the Sept 25th BLM night leads me to believe that there was no incident."  *Id.*  Under ordinary circumstances, a court might permit Mr. Charles offer limited testimony on this issue.  For example, a court could permit an expert to testify that, in his experience, when officers write tickets months late, they do not follow best police practices.  But Mr. Charles has not articulated how his experience as an officer (or any other data point) would lead him to this hypothetical conclusion.  He offers no examples—from his experience or otherwise—that can give the Court confidence that Mr. Charles is not just asking the Court to take his word for it.

Additionally, Mr. Charles offers no explanation for why the belated issuance of a ticket leads him to the conclusion that no incident occurred at all.  To be sure, courts routinely admit expert testimony of this sort that is properly supported by an explanation.  For example, in *Doe v. City of New York*, No. 22-CV-2690, 2024 WL 1134568, at *7 (S.D.N.Y. Mar. 15, 2024), the court permitted a police procedures expert to testify, in hypothetical terms, as to the proper handling of documentation during a police investigation.  Given the similarities here—to wit, that Mr. Charles is purporting to opine on the proper method and timing for issuing tickets—one might assume that Mr. Charles's opinion should similarly be admitted.  Quite the contrary.  A cursory look at the expert opinion in *Doe* reveals that the expert provided specific reasons for his opinions.  For example, the expert opined that a particular "text message should have been saved in the [Confidential Informant] folder."  But critically, the expert then explained *why*: "the reason that the text message should have been saved in the CI's file is because. . . ."[9] Given that Mr. Charles has not put forth *any* support beyond his own speculation and provided

---

[9] The expert report in *Doe* is available at ECF No. 154-1 in that case.

no reasoning for his conclusions, the Court concludes that such testimony contains little probative value and its highly prejudicial nature supports exclusion.

For these reasons, the third, fourth, fifth, and eighth opinions in the Report are not admissible.

### 3. Mr. Charles's Sixth and Seventh Opinions Are Inadmissible

Mr. Charles's next set of opinions concern the SLA. First, he opines that "[6] it is my opinion that the Blackthorns [sic] two [SLA] focal points investigations were unmerited." ECF No. 79-2 at 4. He also states that "[7] Blackthorn's Emergency Suspension [by the SLA] was unmerited." *Id.*

Mr. Charles is not qualified to opine on matters relating to the SLA. When a witness relies "solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached . . . and how that experience is reliably applied to the facts." *Cerbelli*, 2006 WL 2792755, at *2 (citation omitted). To start, Mr. Charles does not purport to rely on anything other than experience to support his qualifications to opine on SLA issues. And critically, Mr. Charles conceded at the July 31, 2025 *Daubert* Hearing that his experience with the SLA is extremely limited. When asked to describe "any prior experiences with the State Liquor Authority," Mr. Charles gave only two examples. Tr. 42:2-4. First, he "had a murder investigation in nightclub in Manhattan and we had to contact the SLA. How many complaints do they have, things of that nature." *Id.* at 42:8-10. Second, he "had another stabbing in a bar, contact the SLA, that was it." *Id.* at 42:11-12.

These threadbare experiences are thus limited to contacting the SLA for assistance with violent crime investigations. They have precious little to do with the SLA's protocol for investigating bars and could not possibly assist Mr. Charles in opining on the appropriateness of SLA focal point investigations and emergency suspensions. And Mr. Charles makes no effort to

connect these experiences over 20 years ago to his own conclusions in this case. In offering

support for his opinion that the "two focal point investigations were unmerited," Mr. Charles

relies on the SLA prosecutor's deposition testimony and concludes that Blackthorn's conduct did

not meet the standards for a focal point investigation. ECF No. 79-2 at 4. The reasoning falters

from the start. First, it is entirely untethered from Mr. Charles's own minimal experience with

the SLA and instead based on a snippet of deposition testimony regarding one situation in which

a focal point investigation could be appropriate. Second, it relies on Mr. Charles's non-expert

and conclusory opinion that "[t]he Blackthorn was never a drain on the resources of the police

department." *Id.* Mr. Charles's testimony on the impact of the Blackthorn on police resources is

not supported by a single citation to the record. And indeed, the only source cited in support of

this opinion is a vague reference to "emails between Pope and Fleming." *Id.* But Mr. Charles

directs the Court to *no* specific emails in the record that actually support this conclusion. Even if

he had, interpretation of email communications between Pope and Blackthorn employees does

not require the assistance of expert testimony.

     Mr. Charles's seventh opinion—that the emergency suspension was unmerited—stands

on even shakier grounds. Mr. Charles relies on the apparent lack of an independent investigation

into the Blackthorn by SLA officials. Because there was no independent investigation, the SLA

"just took the word of a police officer," "ignored their own protocol," and "disregarded

Blackthorn's 18-year stellar history without investigating these allegations themselves." *Id.* Fact

witnesses—not Mr. Charles—will testify on what transpired at the SLA prior to the

implementation of the emergency suspension. *See Stern*, 2015 WL 4530473, at *3-4 (police

procedure expert may not speculate as whether certain events occurred). Regardless, Mr.

Charles has no experience with the SLA, provides no information with respect to how SLA

policies are similar or different to the police department policies he is familiar with, and does not connect his own experience in any meaningful way to the SLA's decisions.

4.      Mr. Charles's Tenth, Eleventh, and Twelfth Opinions Are Inadmissible

In his tenth opinion, Mr. Charles opines that "the RVCPD does not know what they are doing when it comes to SLA inspections or enforcing ABC laws in general." ECF No. 79-2 at 5. In support of this opinion, Mr. Charles notes that, given the large number of liquor licenses in the town, the apparent lack of a policy "is highly problematic because it leaves much room for error, corruption and/or retaliatory behavior against one place over another." *Id.* While this last statement is appropriate expert testimony, Mr. Charles was unable to offer any basis for it. Mr. Charles stated that "[m]ost police departments have policy and procedure subject to almost anything." Tr. 49:13-18. This vague statement does not specifically address whether most departments have an SLA policy. Further, when asked whether he had reviewed policies and procedures from other departments to support his conclusion, Mr. Charles stated that he had reviewed only two: the Village of Hempstead policy from 2009 and a New York Police Department policy from his time as a detective before he retired in 2001. *Id.* at 51:4-52:7. Mr. Charles conceded that the Village of Hempstead policy is not referenced in his expert report. *Id.* at 51:17-19. Nor, for that matter, is the New York Police Department policy. On that basis alone, this opinion must be excluded. *See* Fed. R. Civ. P. 26(a)(2)(B)(ii) (requiring an expert report to contain "the facts or data considered by the witness in forming" opinions). But the problem is more fundamental. Because Mr. Charles has not disclosed the basis for his opinion, the jury would have no basis to judge its credibility. Even permitting Defendants to cross examine Mr. Charles on this topic would be futile, because Defendants could not attack the formation of the opinion without the underlying materials on which it is based. Accordingly, the tenth opinion is excluded.

Mr. Charles's eleventh opinion states that "at first glance it appears that Officer Pope is extremely incompetent when it comes to writing a disorderly premise ticket as to when one should and could be written."  ECF No. 79-2 at 5.  To start with the obvious, an opinion prefaced with "at first glance" does little to inspire confidence, and Mr. Charles's statement that Pope is "extremely incompetent" is so patently unhelpful that it warrants no further discussion.  *See id.*  Citing examples of tickets issued to other establishments, Mr. Charles states that Pope's pattern of issuing tickets to Blackthorn when compared to those other establishments is uneven and therefore "selective enforcement and unequal treatment."  As a starting point, this opinion "contains arguments and conclusory statements about questions of fact masquerading behind a veneer of technical language" and therefore is not appropriate expert testimony.  *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00-CV-7242, 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002).  Additionally, the testimony would not be useful because "fact witnesses familiar with [the citations]" will be able to address the meaning of those citations, and the jury will be able to draw conclusions from that testimony without the assistance of an expert.  *Id.*  Mr. Charles's eleventh opinion is therefore not admissible.

Mr. Charles twelfth opinion states that "[i]t's my opinion Pope was clearly using this freedom as an 'SLA' supervisor to be a rogue police officer."  ECF No. 79-2 at 6.  This testimony impermissibly impugns motives to officers that are not appropriate for an expert.  It is well established that "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony."  *Novartis Pharma AG v. Incyte Corp.*, No. 1:20-CV-400, 2024 WL 3608338, at *10 (S.D.N.Y. July 29, 2024) (quoting *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004)).  Mr. Charles purports to opine on Pope's alleged attempt to utilize his power in a particular way—testimony that goes squarely to Pope's state of mind, motivations,

and intentions.  The jury will be able to surmise from Pope's testimony what his motivations and mental state were with respect to the power he apparently held as an SLA supervisor without Mr. Charles's assistance.  And in any event, Mr. Charles's pejorative description of Pope as a "rogue officer," ECF No. 79-2 at 6, is entirely useless to the jury and is therefore excludable on that ground, too.  *See Fate*, 2013 WL 2649548, at *5 (expert could not "offer such manifestly unhelpful testimony as his assertions in the Brave Report that law enforcement officers 'are not psychic and cannot foretell the future'").

## IV.     CONCLUSION

As set forth above, Plaintiffs have failed to meet their burden to show that Mr. Charles's opinions are based on reliable methodology or will be helpful to the jury.  For that reason, Mr. Charles's opinions as set forth in his Report are excluded in their entirety under Federal Rules of Evidence 403 and 702.  Defendant's Motion is therefore granted.

**SO ORDERED**:

Dated: Central Islip, New York
      September 24, 2025

  s/ Lee G. Dunst
**LEE G. DUNST**
United States Magistrate Judge